HEARD APRIL TERM, 1873.

## STATE *vs.* COUNTY TREASURER.

No provision of the Constitution of the United States or of the State inhibits the Legislature of the State from passing an Act depriving the citizen of his existing remedy by prohibition to stay the collection of taxes illegally assessed upon his property.

A provision that "the collection of taxes shall not be stayed, or prevented, by any injunction, writ or order, issued by any Court or officer, except as provided for in this Act, and in the Act to provide for the assessment of property," is included in one general subject expressed by the title of an Act entitled "An Act to amend an Act entitled 'An Act to provide for the assessment and taxation of property.'"

The provision in Section 15. Article IV, of the Constitution of the State, that the Courts of Common Pleas "shall have power to issue writs of *mandamus,* prohibition, *scire facias,* and all other writs which may be necessay for carrying their powers fully into effect," does not inhibit the Legislature of the State from excluding the theretofore existing remedy by prohibition in a particular case.

BEFORE GRAHAM, J., AT CHARLESTON, JUNE TERM, 1872.

These were applications to the Circuit Court of Common Pleas for writs of prohibition—one by the South Carolina Society, and the other by the Hebrew Orphan Society, against William M. Gurney, County Treasurer, and Samuel L. Bennett, County Auditor.

The facts of the case and the points of law raised are fully stated in the opinion of the Circuit Judge, which is as follows:

GRAHAM, J. These cases were brought before me by suggestions praying for writs prohibiting the defendants and their successors in office from collecting taxes assessed and charged against the relators on the books of the County Treasurer for the years 1868, 1869, 1870 and 1871.

Rules were thereupon issued in each case against the defendants, requiring them to shew cause why the prayer should not be granted. Returns were made accordingly, and the causes argued on the 5th instant, the Attorney General appearing for the defendants, and Hayne & Son and J. N. Nathans for the relators.

The relators allege in their suggestions that the societies named are institutions of purely public charity, and that all their property is used exclusively for the maintenance and support of said institutions. Affidavits were also submitted in support of the suggestions.

And the relators claim that such property is exempt from taxation by clause 9, Section 6, Chapter XII, Title III, of the General Statutes, and that the assessment and taxation of said property is therefore illegal and erroneous, and the defendants should be restrained and prohibited from attempting to collect the same.

The allegations of the relators are not denied by the defendants, who, in their returns to the rules, say—" That the writ of prohibition ought not to be granted : first, because Section 62, Chapter XII, Title III, of the General Statutes, declares that ' the collection of taxes shall not be stayed or prevented by any injunction, writ or order, issued by any Court or Judge thereof;' and, second, because the relators are not exempt from taxation of their property, and are in law and duty bound to pay the taxes charged against them as aforesaid."

The first point to be determined, then, is whether this Court has jurisdiction of the subject-matter, so as to grant the relief asked ·for, or whether it is deprived of such jurisdiction by the legislative inhibition relied on by defendants.

The questions now raised have already been presented to the Court in another form, and it is necessary to refer to the conclusion then arrived at. The present relators, by their attorneys, and the Attorney General, on behalf of the defendants, agreed upon a case to be submitted without controversy.

The facts were agreed upon, and the questions submitted for adjudication were substantially the same now made by the suggestions and returns. The points made were fully argued before me. The Attorney General contended then, as he does now, that this Court has no jurisdiction of the subject so as to grant the relief asked for. That, although the taxes assessed and charged against the relators have been illegally and erroneously assessed and charged against them, yet this Court cannot restrain or prohibit the defendants from collecting the same, such interference having been forbidden by Act of Assembly. That the only remedy open to a person or corporation illegally and erroneously assessed and taxed is to pay the tax and bring suit to recover back the money. And that, even if the Court had jurisdiction, it ought not to grant the prayer, because the relators are not institutions of purely public charity.

On behalf of the relators it was contended, then and now, that this Court is invested by the *Constitution* with power to issue a writ of prohibition in a proper case; that prohibition is the proper remedy to prevent the collection of taxes illegally assessed, and charged against any person or corporation ; and that the Legislature cannot take away, limit or restrain the constitutional power of the Court in regard to such writ.

The points made, as I have stated, were elaborately argued when the cases were first before me. I came to the conclusion then that the relators are institutions of purely public charity, within the meaning of the Act, and that their property was by law exempt from taxation, but I was not prepared to declare that the Legislature had not the power to prohibit this Court from staying or preventing the collection of taxes. Conceiving it to be a duty of a Circuit Judge to sustain the constitutionality of an Act, except where it is clearly and manifestly repugnant to the Constitution, I, in the case before me, decided in favor of the Act relied on by the Attorney General, and that this Court had no jurisdiction of the subject-matter so as to grant the relief asked for. Having so decided, it was unnecessary to give any opinion on the other points presented, and I, accordingly, expressed none.

The relators appealed from my decision and the cases came before the Supreme Court. The appeal was dismissed, but the opinion rests upon a ground which does not apply to the case now presented. The Court say "the Circuit Judge refused the application for the prohibition for want of jurisdiction. He has not set forth the reasons which induced his conclusions, and we are, therefore, left to determine for ourselves how, *as the Judge of a Court, invested by the Constitution with power to issue writs of prohibition*, he did not regard himself authorized to consider the point made by the proposed case before him." After referring to the course of practice heretofore prevailing in this State in regard to prohibitions, and pointing out that the parties to the case, then before them, had resorted to a different form of practice—one provided for in the Code—and that the form of procedure in relation to the writ of prohibition remains as it stood before the Code, the Court conclude that as they "are not furnished with the view which controlled the decision of the Circuit Judge, if it is apparent, as it must be conceded it is, that *though invested with power to grant a writ of prohibition*, he can only exercise it in a case actually pending before him, and that the form in which these parties presented this issue was not appropriate to the remedy selected, how can they undertake to say, in the face of the express exception in the Code, that this conclusion is erroneous." The Supreme Court, apparently, therefore, sustain the Circuit decision solely upon the ground that "the *form* in which these parties presented the issue was not appropriate to the remedy selected," and intimate that the form now presented is according to the course of practice heretofore prevailing in the Courts of this State.

It is proper to remark that the ground upon which the Supreme Court sustains the Circuit decision was not presented to me when the case was heard, nor did it occur to me when I decided the case. My decision was based solely upon the inhibition contained in the Act cited by the Attorney General, which I believed to be a constitutional exercise of power on the part of the Legislature.

The questions before submitted are now again before the Court, without the technical objection to the form of procedure pointed out by the Supreme Court. I have carefully considered the opinion of the Supreme Court, and can come to no other conclusion than that it is a clear intimation from that Court that " as the Judge of a Court invested by the Constitution with power to issue writs of prohibition," it is my duty to entertain jurisdiction of the subject-matter before the Court.

The Court has not, in express terms, decided the point, but their opinion clearly indicates, I think, that the Circuit decision was sustained alone upon the technical ground above mentioned. A proper respect, therefore, to the judgment of that Court requires me, contrary to my former decision, to entertain jurisdiction of the case now made, the technical objection no longer existing. I may be mistaken in regard to the true intent and scope of the decision of the Supreme Court, but I have the satisfaction of knowing that the Court may review my decision, and correct the error, if any ; and that, in no event, can any permanent injury be sustained by any one.

Having thus arrived at the conclusion that this Court has jurisdiction of the subject-matter, it remains to state my reasons for concluding that the pleadings and proceedings in these cases present a proper case for the exercise of the power to grant the writ prayed for. This question turns upon the proper construction to be put upon the phrase " institutions of purely public charity," as used in the Act referred to, and relied on by the relators.

It is conceded that the South Carolina Society and the Hebrew Orphan Society are bodies corporate by the laws of this State; that they have, from time to time, and from various sources, been endowed with and hold property for the purposes which are designated in their charters, and in their by-laws, made in pursuance of said charters ; that these purposes are the relief of such indigent persons, and the maintenance and education of such poor and helpless orphans and indigent children, as they shall judge proper objects

of charity. It is also conceded that all the property belonging to these societies is used exclusively for their maintenance and support, in accordance with their charters and by-laws. If, therefore, the objects of the societies are such as constitute a purely public charity, all their property is clearly exempt by law from taxation, and has been illegally and erroneously assessed. The intention of the Act is, I think, to exempt property used by any institution for objects of purely public charity, whether the institution itself be public or private. Hence, in determining whether these societies are institutions of purely public charity, we must look to the objects or class of persons who come within the. scope of the charity contemplated by their charters and by-laws ; in a word, whether the funds are distributed in public or in private charity. If these objects are public, within the meaning of the Act, then is the charity public likewise. In *Nash* vs. *Morley*, 5 Beav., 183, the Court say : " The expressions 'public' and 'private' are not used in precisely the same sense, when we speak of public and private institutions, as they are when we speak of distributing funds in public or private charity. It is almost impossible to say which charitable institutions are public and which are private in their nature ; and where testators have no particular person in their contemplation, but leave it to the discretion of a trustee to choose out the objects, though such person is private, and each particular object may be said to be private, yet, in the extensiveness of the benefit accruing from them, they may very properly be called public charities. A sum to be disposed of by A. B. and his executors, at their discretion, among poor housekeepers, is of this kind. So in *Attorney General* vs. *Lawes*, 8 Hare, 32, a direction by will to pay unto a certain bank a yearly sum of £100, for the sole use and benefit of any of the, ministers and members of the churches now forming upon the Apostolic doctrines brought forward by the late Edward Irving, who may be persecuted, aggrieved, or in poverty, for preaching or upholding these doctrines," was declared to be a public charity. And in this case, the Vice Chancellor said that the bequest was not the less a charitable bequest from the fact that it was given to a *limited* class of *persons ;* that it was not the number of objects which made the distinction between a *public* and a *private* charity ; that it was not the less a charity because it was confined .to those members of a particular class of persons who were subject to certain grievances and not to the class at large.

Now, the objects of charity contemplated by the charters and by-laws of the "South Carolina Society" and the "Hebrew Orphan Society," are certainly sufficiently extensive to bring them within the foregoing definition of the term "public," as applied to charities, and it remains only to consider whether the distribution of the fund is for *charitable* purposes. The term charity, as used in the Act, embraces, I think, such charities as are within the letter and spirit of the Statute of 43d Eliz., Ch. 4. If the charity is such an one as may be enforced by the State as *parens patria,* through the intervention of its Attorney General or other law officer, should those having control of the funds abuse or misuse them, it is, I think, a public charity, within the meaning of the Act.—Story's Eq. Jur., §§ 1160, 1190, 1191. Information by the Attorney General to enforce charitable donations, where the gift is within the Statute of Elizabeth, are very common in England, and the same practice is recognized in America. But where the gift is not a charity within the Statute of Elizabeth, no information lies in the name of the Attorney General to enforce it.—Story's Eq. Jur., § 1163 ; *Beatty & Richie* vs. *Kentz et al.,* 8 Peters, 566. In this case, a lot in the original plan of an addition to Georgetown, D. C., had been marked for the Lutheran Church as a place of burial from the dedication, and on it had been erected a school house, but no church. The Supreme Court of the United States held this to be a dedication of the lot to the public and pious uses, which might be enforced by the intervention of the Government through its Attorney General or other law officer. I am of opinion, from the authorities cited, that the public has such an interest in the charities contemplated by the societies in question that in case of abuse or misuse of the funds the State might intervene, by its Attorney General or other law officer, to enforce the charity. They are, therefore, I think, public charities. All the property belonging to the societies is used exclusively for their maintenance and support. This being the case, they are institutions of purely public charity, as I interpret that phrase, and all the property belonging to them is, by law, exempt from taxation, and has been erroneously and illegally assessed and charged with the taxes referred to in the suggestions ; therefore, it is

*Ordered,* That the prayer of the relators be granted, and that a writ of prohibition issue from this Court directed to the defendants, Wm. Gurney, County Treasurer, and Samuel L. Bennett, County

Auditor, restraining and prohibiting them, and their successors in said offices, from proceeding to collect the taxes erroneously and illegally assessed and charged against the above named relators or any of them.

The defendants appealed.

*Chamberlain*, for appellants, contended that the remedy by prohibition to restrain the collection of taxes did not exist at common law; that it was an anomalous practice peculiar to this State; and that there was nothing in the Constitution of the United States or of this State which forbid the Legislature of the State from taking it away and providing another, which had been done by the statute mentioned in the opinion of the Circuit Judge. He cited, on this point, 3 Shars. Bl. 112; Com. Deg., Tit. Prohibition; 2 H. Bl., 533; 2 Chit. G. Pr., 355; *Burger* vs. *Carter*, 1 McM., 410; *State* vs. *Carew*, 13 Rich., 498.

*Hayne, Nathans*, contra, contended that Section 15, Article IV, of the Constitution of the State vested the Courts of Common Pleas with jurisdiction to issue writs of prohibition to restrain the collection of taxes; that the jurisdiction existed when the Constitution was adopted, and could not be taken away by Act of the Legislature. They cited *State* vs. *Addison*, 2 S. C., 500 ; Cooley on Con. Lim., 36, 87 ; *Waring* vs. *Clarke*, 5 How., 455; *The Belfast*, 7 Wal., 636; *Briscoe* vs. *Bank of Kentucky*, 11 Pet., 317 ; *Coleman* vs. *Maxey*, 1 McM., 503 ; *Commissioners of New Town Cut* vs. *Seabrook*, 2 Strob., 564; *Alexander* vs. *McKenzie*, 2 S. C., 86; *State* vs. *The Columbia and Augusta Railroad Company*, 1 S. C.

Sep. 6, 1873. The opinion of the Court was delivered by

WILLARD, A. J. The first question to be considered in this case is whether the Circuit Court had authority to grant a writ of prohibition to stay the collection of taxes levied for State and County purposes, as affecting the relators, on the ground that property of relators not subject to taxation had been illegally taxed.

This question depends on the force and effect of Section 5 of the Act entitled "An Act to amend an Act entitled 'An Act to provide for the assessment and taxation of property,'" approved February 28, 1870, (14 Stat., 367.) If this declaration of the legislative authority carries the force of law, then the prohibition in the present case was improperly granted, and must be set aside.

The Section in question is as follows: "The collection of taxes shall not be stayed or prevented by any injunction, writ, or order, issued by any Court or officer, except as provided for in this Act and in the Act to provide for the assessment and taxation of property." There is nothing in either of the Acts referred to that creates any exception to this general language in favor of the proceedings by prohibition. The language employed plainly excludes the use of the remedy by prohibition as a means of staying the collection of taxes.

The will of the Legislature must prevail in this respect, unless there is something in the Constitution of the United States or of the State that deprives it of the force and effect of law. Where the sense of a statute is made out in conformity to established rules of construction, we know of no means of depriving it of the force and effect of law but those afforded by the Constitution of the State or of the United States.

Is there, then, anything in either of these instruments that operates to prevent the execution of the declared will of the Legislature in question?

It is argued that Section 5 is void under Section 20, Article II, of the Constitution of this State, which declares as follows: "Every Act or Resolution having the force of law shall relate to but one subject, and that shall be expressed in the title." Much discussion and contrariety of opinion has been elicited in regard to similar provisions in the Constitutions of some of the other States, with reference to the question whether a disregard of its requirements in the passage of an Act renders such Act nugatory. It will not be necessary to pass upon this question, for, under the view taken of the Act containing the Section under consideration, no conflict with such constitutional requirement exists.

The Act of 1870, according to both its title and the substance of its provisions, is amendatory of the Act of 1868, (14 Stat. 27.) The Act amended is entitled "An Act providing for the assessment and taxation of property." In order to ascertain what is the proper subject of these Acts, within the sense of the Constitution, to which Section 5 must be referred, in order to test its harmony with the Constitution, it is necessary to consider the Act of 1870 as if its provisions were incorporated in and solidified with those of the Act of 1868, so as to make one system of means for the accomplishment of the objects embraced within the title of the Act of 1868.

The proper subject of the Act of 1868 is, the proceedings for the ascertainment of property subject to taxation, for the rateable distribution of the sums required to be raised for public purposes among the tax payers, according to the value of the property legally bound to contribute, for the ascertainment of the sums chargeable to each individual tax payer by way of assessment, for the correction of the assessments, as it regards taxes illegally or erroneously imposed or omitted, and for the enforcement and collection of such taxes. Sections 6, 7 and 8 of the Act of 1870, undertake to ascertain and regulate the remedies for illegal assessments which may be obtained by means of an action at law, materially increasing the efficiency of such remedies.

Are provisions of law defining the remedies incident to the abuse of the taxing power fairly within the subject opened by the title of the Act of 1868? If so, then a provision excluding a remedy previously allowed is as strictly within that subject as one giving a new or modifying an old remedy.

The object of the Act of 1868 is the regulation of the taxing power of the State. Its subject, embracing, as it does, all proceedings properly incident to the exercise of such taxing power, must be regarded as commensurate with all the means by which the object of the Act can either be promoted or defeated. Under such a view, ordinary remedies in the Courts of justice must be considered as included, especially such as tend to arrest proceedings instituted under the authority of the Act. Although the State cannot be impleaded in its own Courts, yet its agents and servants derive no immunity from this fact, where acting without the sanction of law. The effect of a remedy taken against a public officer charged with duties incident to the assessment and collection of taxes may operate upon the State directly, as where the action of the officer is stayed or public funds are tied up in his hands.

The question of remedies against public officers becomes a matter of interest to the State, as affecting the efficiency of its means for raising money by taxation, and, therefore, the regulation of such remedies is the proper subject of a systematic arrangement of the modes of procedure by which the power of taxation is to be exercised.

The term "subject," as employed in the Constitution, must receive a liberal interpretation, not only as employed in imposing limitations to the legislative authority, but in furtherance of the particu-

lar object disclosed by the Section in which it occurs. Its object is in part to secure a systematic treatment of matters for legislation, by drawing whatever appertains to either a particular or general subject into consideration, separate and apart from all other matters not appertaining to such subject, experience having shown that neglect of such systematic treatment exposes the legislative body to imposition by the surreptitious introduction of irrelevant matters, and tends to impair the completeness of their work.

A general subject like that of a system of regulations controlling the exercise of one of the great powers or functions of the government must be considered as equally within the language of the Constitution as a particular subject embracing a few matters of limited interest.

It is clear that the Section under consideration is properly a part of the general subject treated of and embraced in the title of the Act, under the general designation of the class of powers to which the Act relates.

If the Section in question could be regarded in no other light than as destroying an existing remedy, rather than as modifying it with a view to greater efficiency and less detriment to the public interests, still the Act would not be open to objection, unless such destruction contravened some definite clause or limitation of the Constitution. The only clause that has usually been referred to in the general discussion of the powers of the Legislature over remedies is that contained in the Constitution of the United States, as well as of this State, forbidding the passage of laws impairing the obligation of contracts.

That provision is wholly inapplicable here, unless every right that a citizen enjoys under the laws is to be regarded as having its foundation in a contract, as that term is used in the Constitution. That provision contains an important principle. It recognizes the right of two or more citizens to bind themselves by the terms of a contract to a course of action which, if not inconsistent with the law of the land at the time the contract is made, becomes to them a law of as high sanction as that which proceeds from the legislative authority of the State. It recognizes the obligation of such a contract as entitled to be placed beyond the legislative control or interference.

In the present case, the right of the relator to a writ of prohibition, as it existed prior to its repeal, stood on the foundation of a concession by the Act of the law alone, contained in its general

remedial provisions, and was, in no sense, caused by the obligation of a contract, as that term is used in the Constitution.

But the Section under consideration, although it denies a remedy theretofore taken in a particular form, yet it affords one in another form equally as efficient, as we must assume, in the judgment of the Legislature. No one has yet questioned the right of the Legislature to mould and change the forms and characteristics of remedies, even where these remedies are the means of enforcing the obligation of contracts clearly within the protection of the clause of the Constitution under consideration.

It has been said that the terms of the Constitution, fixing the jurisdiction of the Circuit Court, preclude the Legislature from taking away the remedy by prohibition, in the case of illegal taxation, on the ground that such a repeal of an existing remedy would tend to destroy in part a jurisdiction conferred by that instrument.

The clause in question is in Section 15, Article IV, which Section reads as follows: "The Courts of Common Pleas shall have exclusive jurisdiction in all cases of divorce, and exclusive original jurisdiction in all cases and actions *ex delicto* which shall not be cognizable before Justices of the Peace, and appellate jurisdiction in all such cases as may be provided by law. They shall have power to issue writs of *mandamus*, prohibition, *scire facias*, and all other writs which may be necessary for carrying their powers fully into effect."

The questions to be considered are: first, whether the grant of jurisdiction conferred under the expression, "power to issue writs of * * prohibition," &c., operates, in itself, considered as a grant of jurisdiction, as authority for the Court to employ that remedy in all cases in which it had theretofore been employed, independently of an exercise of legislative authority intended to prevent the employment of such writ as a remedy in a particular case; second, whether the terms of the Constitution admit of an interpretation giving them a greater effect than that of a grant of mere jurisdiction, and equivalent to a declaration that the remedies to which the jurisdiction of the Court extends shall remain inviolate, both as it regards the nature and effect of such remedies, and the cases to which they shall be applied. In other words, is the language of the Constitution more than a mere grant of jurisdiction, and, if not, does the grant of jurisdiction, in itself, place the remedy conferred beyond the power of the Legislature to declare that it shall not be

employed in a certain case in which it has theretofore been employed? These questions will be considered in the order above stated.

The first proposition to be considered is, that the possession of full jurisdiction by a Court is consistent with authority in the Legislature to establish, change or abolish any remedy or form of procedure in the Courts, to determine the nature, force and effect of all remedies, and the cases to which they shall be applied. In considering this proposition, it is assumed that the words "power to issue writs" import a grant of jurisdiction merely. If the opposite of this proposition be true, then it would follow that the Courts of England and of this country never had full jurisdiction, for their control over remedies has always been subject to the right of the Legislature to modify or repeal them. The legal idea of jurisdiction has been formed in view of such ample powers residing in the Legislature. The idea of jurisdiction is embraced within that of judicial power, but, when appropriately used, carries with it the recognition of limit to that power in a particular direction. When we are considering judicial powers, in reference to the cases in which it may properly be exercised, we use the term jurisdiction in preference to power, as more exact and descriptive. The idea, then, of jurisdiction is that of power exerted in a given case. Wherever there is a proper case presented for judicial action, there must, of necessity, be, as among parties amenable to the law, a relation recognized by the law as imposing certain obligations, and a state of facts disclosing a want of conformity to such obligations on the part of some of the parties concerned. If, then, the law has declared as the consequence of such a state of things, that the party in fault shall perform some act, either in direct satisfaction or compensatory for its non-fulfillment, or that he shall abstain from some threatened act of wrong, a Court having jurisdiction may so declare, and enforce its declarations by proper means. Now all that is implied by the idea of jurisdiction is the right to declare the proper legal conclusion from the state of facts presented, with authoritative and, under certain circumstances, conclusive effect. The nature and force of the obligation involved, and the consequences of want of conformity to it, are all fixed by the law-making authority, either by direct enactment or by its sanction of the unwritten law of the land. In neither of these particulars does the proper course of judicial action depend upon the will of the judicial body. The fact

that, in declaring the unwritten law in a doubtful case, a Judge is liable to mistake the inclination of his own mind for the dictates of the law, only illustrates the importance of keeping the true nature of the judicial action clearly and constantly before the judicial mind. Inasmuch, then, as all the elements of every judicial question arise out of the expressed will of the law-making authority, except those that depend on the conduct of the parties, the judicial act can by no possibility impose a limitation upon the freedom of the legislative will. Judicial jurisdiction may be perfect, and yet the legislative power may be free from all constitutional restrictions, as is the case in England. It follows that there is nothing in a grant of judicial jurisdiction that tends in any way to affect the limits of legislative power, beyond what may be accomplished by placing the Constitution of the Court beyond legislative control as it regards the right to exercise such jurisdiction.

If, then, Section 15, considered as a mere grant of jurisdiction, cannot operate to limit the legislative authority over remedies, can the terms of that Section be regarded as indicating an intent, beyond that of lodging jurisdiction, equivalent to a declaration that the remedy by prohibition shall remain forever unchanged as heretofore existing?

This Section must be construed, if possible, as allowing full force and effect to Section 1, Article IV, vesting the full legislative power of the State in the General Assembly. Implied limitations of legislative power are only admissible when the implication is necessary, as when language conveying a particular intent cannot have its proper force without the allowance of such limitation. It cannot be successfully contended that Section 15 will be shorn of the effect due to its terms if construed as a grant of jurisdiction strictly. On the other hand, to enlarge its sense will have the effect of introducing consequences clearly not intended by the Constitution. Whatever Section 15 intended as to the grant of jurisdiction in the case of prohibition must be considered as applicable to all branches of jurisdiction named in that Section. If the power of the Legislature to repeal the use of prohibition in a particular case must be regarded as taken away by that Section, then the same result must follow as it regards writs of *mandamus, scire facias,* and all other writs essential to carrying out fully the powers of the Circuit Court. It must also apply to all cases of divorce, and all cases and actions *ex delicto,* and to matters of equity, provided for in the sixteenth

Section. Such a construction would be equivalent to a declaration that the Legislature is stripped of all power to take away a remedy when existing and allowed by law at the adoption of the Constitution. Inasmuch as the Legislature of this State has always enjoyed this power, in common with all other legislative bodies of a similar character, it will be, in effect, radically changing the balance of power between the Legislature and the judiciary, on no higher ground than that of a doubtful implication. If the Legislature cannot be trusted with control over remedies, then it is for the people, who have the right to subject that body to limitations, to interpose, by the expression of a clear intent, to effect such limitation. It is not the province of the Courts to devise means of keeping legislative authority within proper bounds. To raise out of Section 15 an implication of such a character could only be regarded as an attempt on the part of the Court to devise limits to legislative authority not clearly imposed by the supreme legislative power. A greater misfortune could not befall a State than legislation springing from distrust of the judiciary, and judicial action prompted by distrust of the legislative authority. Whatever abuses may exist in either of these branches of the government, to preserve the true constitutional balance between these great functions of the government is the first duty of the judiciary looking to their reform.

There is nothing in the Constitution showing an intent to give any new character or definition to judicial jurisdiction. The Circuit Court is not a new creation of the Constitution, without antecedents from which its characteristics can be judged. It was and is a Court of record, of original jurisdiction, proceeding according to the course of the common law, but with general equity powers added. Unless we are forced by clear language to a different conclusion, we must assume that it was the intent of the Constitution to put that Court on the same footing occupied by its predecessors. There is nothing in the terms employed that compels any other conclusion in the present case.

The present case illustrates most forcibly the inconvenience of the construction contended for. Under the existing laws, the duties imposed on the officers charged with the imposition and collection of taxes are purely political duties of an administrative character. There is no recognized precedent, either at common law or in the practice of the Courts of Equity, for the Court, by any writ or process, to lay its hands upon and stop the motion of the political ma-

chinery of the government. The law generally holds the party guilty of an abuse of political power respónsible for the consequences of that abuse, but it never, without disregarding the principles of sound government, undertakes to stop by the hands of one branch of the government the exercise of political powers by another branch. The writ of prohibition, as used at common law, never fulfilled this function. It issued from the higher branch of the Judiciary to stop assumptions of jurisdiction by judicial bodies of limited powers. Its operation was entirely confined within the judicial system itself. The remedy by prohibition in the case of an illegal tax was allowed in this State formerly, but it was recognized as exceptional. Its allowance cannot be satisfactorily accounted for, unless it proceeded upon the ground that the imposition of taxes was an exercise of judicial or at least *quasi* judicial power.

Whatever may have been the reasoning that induced its allowance under the then existing state of the law, it is clear that to employ that writ at the present time for the purpose claimed is to require the judiciary to do that which, according to the principles of the common law, they could not do, namely, lay hold of political powers in the hands of an administrative officer and mould their exercise according to the judicial idea of their proper use. The practice of England and of the other States is against the allowance of interference of that character. We have not outlived the hardy wisdom of our ancestors, although we may claim to ourselves more art in carrying into operation the principles of law which they understood so well. To hold that the Legislature may not repeal the use of this remedy is to hold that they have not power to avail themselves of the experience and practice of other States in regard to the most important class of powers on which the organization of the means of continuing efficiently the exercise of governmental functions depends.

No sufficient ground has been shown for denying to the Section of the statute the authority of law, and the relator's application should have been dismissed by the Circuit Court.

The proceeding below must be dismissed.

*Wright*, A. J., concurred.

MOSES, C. J., dissenting. A writ of prohibition to restrain the Treasurer and Auditor of the County of Charleston from the collection of taxes, alleged to be erroneously assessed and charged

against the relators, was, in due form, issued by the presiding Judge of the Court of Common Pleas of the First Circuit. An appeal has been taken to this Court to reverse his judgment: 1st. For want of jurisdiction to issue the writ in tax cases; and, second, whether, admitting the jurisdiction, the respondents are entitled to the relief sought, as within the exemptions from taxation provided by law.

The first ground involves the validity of Section 5 of the Act of the Legislature of 28th February, 1870, " to alter and amend an Act entitled ' An Act to provide for the assessment and taxation of property,'" Gen. Stat., Sec. 62, Ch. 13, p. 96, which declares " that the collection of taxes shall not be stayed or prevented by any injunction, writ or order, issued by any Court or Judge thereof." If this provision does not conflict with the Constitution of the United States or the State, by affecting powers granted by the latter to any · other co-ordinate department of the government, virtually destroying their exercise, it must operate as the expression of the legislative will, in a matter over which it had full and unreserved control.

While it is not impugned by reason of any repugnance to the Constitution of the United States, it is alleged to be in conflict with the 15th Section of the 4th Article. of the Constitution of the State, which confers on the Courts of Common Pleas power to issue writs of prohibition, *scire facias*, and all other writs which may be necessary for carrying their powers fully into effect ; that it thus by statute attempts to deprive the Judicial Department of the government of a jurisdiction expressly conferred upon it by the Constitution, and is, therefore, void and of no effect.

It is not to be denied that, at and long before the adoption of the Constitution of 1868, prohibition was recognized as an appropriate remedy for the stay of the collection of taxes erroneously imposed. Its long use in practice for such proposed object in South Carolina was as well understood as its more restricted purpose at common law. In *Burger* vs. *Carter*, 1 McM., 418, the question was directly made, and Judge O'Neall, delivering the opinion of the Court in regard to the objection that the writ would not lie to restrain the enforcement of a tax execution, said : " I concede that if we were obliged to resort for authority in this respect to English precedents, we could not sustain this proceeding, for, according to them, the writ of prohibition only lies to prohibit the enforcement of the judgment of an inferior jurisdiction, where it has proceeded without jurisdiction, or where, having jurisdic-

tion, it has exceeded it. But in this State it has had a wider operation. For the want of a better remedy, it has been allowed to restrain the enforcement of tax executions. How this practice began, it is difficult as well as unimportant to ascertain. * * * The practice is well established, has never before been questioned, has operated to the protection of the citizens, and, so far as our experience or information extends, has effected no injury, and produced no inconvenience." So well has the practice been understood, that it has not since been questioned, and as late as April, 1871, in the case of the *Hibernian Society* vs. *Addison*, 2 S. C., 500, the same mode of procedure was followed, without any intimation of objection.

When the Constitution vested the Circuit Courts with the power to issue writs of prohibition, it must be understood as extending it to the writ as then accepted and recognized in South Carolina. If it had been here applied to cases in which in England it would not have been considered a proper remedy, the use of the term in the Constitution must be received in the import which attached to it at the time of its adoption. There is nothing expressed or implied, by which its operation, as then understood, can be contracted or diminished. A legal definition of it had been given by the Courts of the country. It was to have effect in the community for whose government and protection the Constitution was ordained and established, and its use in that instrument must be referred to the acceptation in which it had theretofore been received. Modifications, in the form and application of actions, both *ex contractu* and *ex delicto*, as they prevailed at common law, had been made in our Courts prior to 1868, and when such actions are referred to in the Constitution no change was intended, to conform them to the common law in the particulars from which they had departed. " A Constitution is not the beginning of a country nor the origin of appropriate rights. It is not the fountain of law nor the incipient state of government. It grants no rights to the people, but is the creature of their power—the instrument of their convenience. Designed for their protection in the enjoyment of the rights and powers they possessed before the Constitution was made, it is but the framework of the political government, and necessarily based upon the pre-existing condition of laws, rights, habits and modes of thought." See Cooley on Con. Lim., 37. It is said in 2 Story on Constitution, Sections 424-6, that " where a power is granted in general terms

the power is to be construed as co-extensive with the terms, unless some clear restriction upon it is deducible (expressly or by implication) from the context." In *Waring* vs. *Clarke*, 5 How., 454, it was held that the judicial power of the Courts of the United States, in cases of admiralty and maritime jurisdiction, was not restricted to the same jurisdiction as it existed in England when the Constitution of the United States was adopted. Mr. Justice Wayne, delivering the opinion of the Court, on page 445, says, "those who framed the Constitution, and the lawyers in America in that day, were familiar with a different and more extensive jurisdiction than was allowed in England, from the interpretation which was given by the common law Courts to the restraining statutes of Richard II and Henry IV." In the case of *The Belfast*, 7 Wall, 636, Mr. Justice Clifford says: "Judicial power to hear and determine controversies in admiralty, like other judicial power, was conferred upon the Government of the United States by the Federal Constitution, and by the express terms of the instrument it extends to all cases of admiralty and maritime jurisdiction, which, doubtless, must be held to mean all such cases of a maritime character as were cognizable in the Admiralty Courts of the States at the time the Constitution was adopted."

Unless the Constitution otherwise declares by express words or necessary implication, pre-existing laws are not repealed, and its various grants of power must be construed by the lights which they afford. On this principle proceeded the case of *White* vs *Kendrick*, 1 Brev., 469, and it was more distinctly enforced in *Coleman* vs. *Maxcy & Arthur*, 1 McM., 501, in which it is said, referring to the words, "law of the land," "by analogy, it has been held in this State that the same terms used in our Constitution, (1790,) must embrace the common law as then adopted here, and the statutes of Great Britain and of this State made of force and in operation at that time." The same view was recognized in *Commissioners of New Town Cut* vs. *Seabrook*, 2 Strob., 565. To these authorities may be added the case of *McKenzie* vs. *Alexander*, 2 S. C., 81, decided by this Court, in which it was held that "Section 4, Article IV, of the Constitution, declaring that the Supreme Court shall always have power to issue writs of *mandamas, quo warranto* and *habeas corpus*, was not inserted in that instrument for the purpose of perpetuating a mere form, but for the purpose of vesting the Court with jurisdiction in that class of cases where the writ of *quo war-*

*ranto* was the proper remedy at the time of the adoption of the Constitution." Our Associate, Mr. Justice Willard, delivering the opinion of the Court, looking to the use of the said terms in the Constitution, at page 86, says: "The writs of *mandamus, quo warranto* and *habeas corpus* are referred to as a convenient and usual means of marking out the limits of jurisdiction intended for the Supreme Court. In legal parlance, the writ or form of action is allowed to personate and stand for the jurisdiction to which it relates, to avoid inconvenient particularization. It is in this sense that the terms are here used. Such writs were then in common use and furnished the common forms of expression for conveying the sense thus intended by this Section. To separate the expression 'shall always have power to issue writs,' &c., from the context, might create a doubt whether the conservation of the writ or the extent of the powers of the Supreme Court was the object in view, but, read by the context, it is clear that the technical value of the writs, as remedial means, was not the subject of consideration; but substantial rights, to be protected by lodging certain judicial powers in the Supreme Court, was the single end contemplated."

If the power to issue the writ in question was conferred by the Constitution on the Circuit Court, to be exercised in cases where, at its adoption, it was the recognized remedy for the purpose claimed by the suggestions now before us, can the Court be deprived of its jurisdiction by the action of the Legislature? If it can, then the powers of the Court granted and prescribed by the Constitution, and to be enforced through a separate and co-ordinate division of the government, independent of all other of its branches, does not depend upon the judgment of those to whom alone it is confided, but is at the change, direction and control of another of its departments, from which it was intended to be forever distinct. If subject to the interference of the Legislature in the exercise of its legitimate functions, then the Legislature become the judges of the force and validity of the very laws which they themselves enact. This would not be in harmony with the long prevailing notions of a Republican government. The judicial power of the State is vested in the Courts, and the Constitution requires "that the legislative, executive and judicial powers of the government shall be forever separate and distinct from each other." The judicial branch is a restraint on that portion of it invested with the law-making power, and if it can enforce its own legislation by depriving the Courts of the

authority to test its action by an inquiry into its sanction by the Constitution, then the protection intended for the citizen in "his life, property and character," through a resort to the Courts, would be a mere mockery and delusion.

But it is said that, notwithstanding the general grant of power in regard to this writ, the Legislature may, nevertheless, determine in what cases, and under what circumstances it may issue. This concedes an unlimited control to the Legislature of the whole judicial magistracy of the State, which, in the end, might be so exercised as to suppress its entire authority. If it can declare in what cases a particular form of action shall be a remedy for an alleged complaint, and ignore its application to other cases, in which, at the adoption of the Constitution, it was employed as a medium through which a wrong was to be redressed, may it not, step by step, disarm the Courts of all their authority, and at last leave it but a tribunal to carry out the behests and mandates of the legislative will? The power to tax is the most extensive and unlimited of all the powers which a legislative body can exert. It is without restraint, except by constitutional limitations. To tie up the hand that can alone resist its unlawful encroachments would not only render uncertain the tenure by which the citizen holds his property, but would make it tributary to the unrestrained demands of the Legislature. The prohibition is without qualification. As if to leave no opportunity for any legitimate test of its exactions, it declares that "the collection of taxes shall not be stayed or prevented by any injunction, writ or order, issued by any Court or Judge thereof." No matter how excessive or unjust the requisition of the Treasurer, however unreasonable or extravagant, the remedy, which, at the adoption of the Constitution, was the ready means to which the citizen could resort to test the validity of the demand, and which in terms is included in the grant of powers by that instrument conferred on the Courts, is withdrawn and destroyed. In support of this legislation it is said that in lieu of the one forbidden another has been substituted by allowing "an action or proceeding against a County Treasurer for the purpose of recovering taxes alleged to have been erroneously assessed and collected." This is a remedy of entirely another character, and to attain a different end, and one which before appertained to the citizen, if he was forced to pay an unlawful tax. The object of the writ of prohibition is to restrain the collection of the tax. In *Reed et al.* vs. *Tyler et al..*, 56 Ill. R.,

292, it was held that a statute requiring the payment of redemption money and interest as a condition precedent to questioning the validity of a tax deed, was unconstitutional. Can it be reconciled with any principle of right or justice that the State shall say, notwithstanding your complaint and assertion of injustice against our demand, we will force you to pay it by preventing your resort to our own Courts and leave you to your action for its recovery? If the tax demanded should prove to be, not only beyond the competency of the Legislature in its imposition, but increased in amount by the extortion or cupidity of the tax officer, must the citizen be required to pay it, and deprived for an indefinite period of the enjoyment of the amount exacted, and left to a compulsory resort to an action for its recovery? Such a course appears to be at variance with the principles on which our government is founded.

It is the boast of the law that it affords a remedy for every wrong. Is not the enforcement of a tax, either excessive as to amount or not imposed according to existing legal requisitions, a wrong? and where is the remedy by which its payment can be resisted if that afforded by the Constitution is suppressed? Sir Edward Coke, referring to the emphatic words of Magna Charta, says in 2d Inst., 55: "Every subject, for injury done to him *in bonis, in terris, vel persona,* by any other subject, be he either ecclesiastical or temporal, without any exception, may take his remedy by the course of the law, and have justice and right for the injury done to him, freely without sale, fully without any denial, and speedily without delay."

It is a delicate duty to declare an Act of the Legislature void. If, however, in the judgment of the Court, the enactment is without constitutional right, there is no alternative but to do so. As was most appropriately said by Judge Waties, in *Lindsay et al.* vs. *Commissioners*, 2 Bay., 61: "In exercising this high authority, the Judges claim no judicial supremacy; they are only the administrators of public will. If an Act of the Legislature is held void, it is not because the Judges have any control over the legislative power, but because the Act is forbidden by the Constitution, and because the will of the people, which is therein declared, is paramount to that of their Representatives, expressed in any law."

Entertaining, on the question made, the views which I have herein expressed, I cannot concur in the judgment of the Court.